RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0130P (6th Cir.)
File Name: 04a0130p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

EVERETT HADIX, et al.
      *Plaintiffs-Appellees,*

      *v.*                          No. 03-1334

PERRY M. JOHNSON, et al.,
      *Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Western District of Michigan at Kalamazoo.
No. 92-00110—Richard A. Enslen, District Judge.

Argued: February 5, 2004

Decided and Filed: May 6, 2004

Before: KENNEDY, DAUGHTREY, and COLE, Circuit
Judges.

_____

## COUNSEL

**ARGUED:** A. Peter Govorchin, OFFICE OF THE
ATTORNEY GENERAL, CORRECTIONS DIVISION,
Lansing, Michigan, for Appellants. Elizabeth R. Alexander,
NATIONAL PRISON PROJECT, Washington, D.C., for
Appellees. **ON BRIEF:** A. Peter Govorchin, Leo H.
Friedman, OFFICE OF THE ATTORNEY GENERAL,

CORRECTIONS DIVISION, Lansing, Michigan, for
Appellants. Elizabeth R. Alexander, NATIONAL PRISON
PROJECT, Washington, D.C., Michael J. Barnhart, Detroit,
Michigan, Patricia A. Streeter, Ann Arbor, Michigan, for
Appellees.

_____

## OPINION

_____

KENNEDY, Circuit Judge. Defendants appeal district
court's issuance of an injunction in this long-pending case
dealing with conditions within the State Prison of Southern
Michigan, Central Complex (SPSM-CC). Defendants argue
that the district court erred when it found that the failure to
modify the long-existing structures and to take other steps to
protect prisoners from injury or death by fire resulted in a
constitutional violation. Defendants also argue that the
district court improperly exercised its jurisdiction over
facilities not subject to a Consent Decree. We reverse and
remand on the issue of constitutional violation and affirm on
the issue of jurisdiction.

## BACKGROUND

In 1980, Everett Hadix and other prisoners incarcerated at
the SPSM-CC brought a class action pursuant to 42 U.S.C.
§ 1983 in the United States District Court for the Eastern
District of Michigan against various state officials charged
with operation of SPSM-CC. In the complaint, the inmates
alleged that the conditions of their confinement violated their
rights under the First, Eighth, Ninth, and Fourteenth
Amendments. On April 4, 1985, the parties entered into a
Consent Decree covering most aspects of health care, fire
safety, sanitation, safety and hygiene, overcrowding and
protection from harm, volunteers, food service, management,
operations, access to courts, and mail. Although the state
officials admitted no liability on the claims, the Consent

Decree explicitly stated that it was intended by the parties to assure the constitutionality of the conditions under which prisoners are incarcerated at SPSM-CC. Under the terms of the Consent Decree, the state officials retained the ability to apply for termination of the decree once they achieved full compliance with all decree provisions. The district court retained jurisdiction to enforce the terms of the Consent Decree until compliance was achieved. In 1992, the Eastern District of Michigan transferred the medical and mental health components of the Consent Decree to the Western District of Michigan.

In April 1996, Congress enacted the Prison Litigation Reform Act of 1995 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321-66 (1996), amending 18 U.S.C. § 3626. Section 802(a)(1) of the PLRA directs that prospective relief in prison conditions cases "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). Section 802(b)(2) of the PLRA entitles the defendant "to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(b)(2). The prospective relief, however, "shall not terminate if the court makes written findings based on the record that prospective relief remains necessary[, narrowly drawn, and the least intrusive means] to correct a current and ongoing violation of the Federal right." 18 U.S.C. § 3626(b)(3). Following the enactment of PLRA, Defendants moved to terminate the Consent Decree pursuant to 18 U.S.C. § 3626(b)(2)-(3). On November 18, 1996, the district court ruled that the immediate termination provision of the PLRA was unconstitutional. In the same ruling, the court denied Defendants' motion for immediate termination and ruled that the Plaintiffs sustained their burden by proving the existence of constitutional violations as to sections II.A.3.b. Transfer Medical Evaluation; II.A.4.a. Sick Call

Access Plan; II.A.5.a. Professional Staff; II.A.7. Chronic Disease Plan; and II.A.11. Problem Oriented Medical Record-Health Related Disabilities of the Consent Decree. Finally, the court also ruled that Plaintiffs failed to sustain their burden proving the existence of current constitutional violations as to the remaining health care provisions of the Consent Decree. Defendants appealed the November 18, 1996 order and this Court, in a January 22, 1998 Opinion, dismissed the appeal for want of jurisdiction.

On March 18, 1999, the Eastern District transferred sections I.P., I.Q., and I.S. of the Consent Decree (regarding water temperatures, housing temperatures, and ventilation, respectively) pertaining to facility B (Southern Michigan Correctional Facility or JMF) to the Western District. The Eastern District also transferred to the Western District Defendants' proposed alternatives to Facility A (Egeler Correctional Facility[1] or SMN). On December 2-3, 1999, the Western District conducted hearings on the medical health care provision of the Consent Decree and other issues transferred by the Eastern District.

On February 18, 2000, the district court issued its Order and Findings of Fact and Conclusions of Law. The district court reaffirmed its findings from November 18, 1996, that (1) Plaintiffs sustained their burdens by proving the existence of constitutional violations with regard to sections II.A.3.b., II.A.4.a., II.A.5.a., II.A.7., and II.A.11 and (2) Plaintiffs failed to sustain their burden of proving the existence of constitutional violations as to the remaining health care provisions of the Consent Decree and terminated its jurisdiction over those provisions. Additionally, the district court found that the temperature, ventilation and fire safety

---

[1]There are 993 cells in the three blocks that make up Eleger (Block 1 has 334, Block 2 has 308, and Block 3 has 351). There are currently no prisoners housed in Block 1. Block 2 houses parole violators and Block 3 house parole violators and 10-12 general population inmates.

conditions at JMF, Egeler, and Administrative Segregation[2] support a finding of constitutional violations. The February 18, 2000 order was not final, as the district court reserved judgment on termination of other portions of the Consent Decree and the entry of any remedial order.

On July 12, 2000 the Eastern District transferred to the Western District Plaintiffs' claims that conditions in Facility C (State Prison of Southern Michigan–Central Complex or SMI) with regard to water, temperature and ventilation (Sections I.P., I.Q., and I.S., respectively), endanger the health of prisoners. On November 15, 2000, the Eastern District transferred to the Western District Plaintiffs' claims that the conditions in Facility D (Parnall Correctional Facility or SMT) with regard to temperature and ventilation (Sections I.Q and I.S., respectively). On November 8, 2001, Defendants notified the district court that as a result of a reduction in the MDOC's general fund budget, Facility C (or SMI), including the administrative segregation unit, would be vacated. On January 4, 2002, SMI was emptied of all prisoners. There are no current plans to reopen SMI, and any reopening of SMI would be contingent upon future bed space needs and finances.

On April 8, 2002, pursuant to a stipulation of the parties, the Western District terminated its jurisdiction over Section I.P. (water temperature) of the Consent Decree as to all *Hadix* facilities.[3] On May 3, 2002, pursuant to a stipulation of the parties, it also terminated its jurisdiction over Section I.S.

_____

[2]There are between 200 and 220 inmates in Administrative Segregation.

[3]The *Hadix* facilities were originally defined as "all areas within walls of the State Prison of Southern Michigan at the time this cause commenced and all areas which will supply support services under the provisions of the Consent Judgment." Order Accepting Consent Judgment, May 13, 1985. The "within walls of the State Prison of Southern Michigan" meant the Central Complex.

(ventilation) of the Consent Decree as to Blocks 1 and 3 of the Egeler Facility, Block 7 (the Reception and Guidance Center), Block 8 of the Parnall Facility, and SMI administrative segregation. On May 6-8, 2002, the district court conducted hearings on the remaining medical health care provisions of the Consent Decree and other issues transferred by the Eastern District. On October 29, 2002, the district court issued its Order and Injunction and Findings of Fact and Conclusions of Law. The court determined that the existing system of health care continues to violate sections II.A.3.b, II.A.4.a., II.A.5.a., II.A.7., II.A.11. of the Consent Decree and the Eighth Amendment. The court further found that Defendants' failure to protect prisoners from heat-related illnesses and the risk of injury from smoke and fire for prisoners with disabilities and chronic diseases resulted in current and ongoing violations of the Consent Decree and the U.S. Constitution.

On the basis of those findings, the district court concluded that termination of the remaining portions of the Consent Decree was inappropriate, that remedies are appropriate, and that further briefing and hearing were necessary to determine the scope of remedies. Accordingly, the district court ordered the parties to further brief the question of whether there is any alternative to compartmentalization,[4] consistent with Section VIII of the Consent Decree, as a remedy for the fire safety problems and risks. After the briefing, the district court issued its Injunction on February 25, 2003, in which it ordered compartmentalization of the facilities as the fire safety remedy. The injunction applied to Facilities A (Egeler) and D (Parnall). The court further ordered Defendants to

_____

[4]"Compartmentalization" means subdividing the building into smaller units to limit the area that is affected by a fire or smoke, including the number of people that might be in that area. This allows people to evacuate horizontally, as well as down the stairs. It also allows them to evacuate quicker by shortening the traveled distance to a place of safety. The last dollar cost estimate for compartmentalization of Egeler was $25 million in the early 1990s.

submit by December 31, 2003, a synopsis of their intended facilities and process modifications, detailed architectural site plans and construction schedule for approval by the court.

## ANALYSIS

Defendants on this appeal argue that the district court abused its discretion and erred (1) by exercising its jurisdiction over facilities not subject to the Consent Decree[5] and (2) in its conclusion that the MDOC's failure to protect prisoners from injury or death by fire constituted a constitutional violation. We address these contentions in turn.

I. *Subject matter jurisdiction*

Defendants argue that the district court lacked subject matter jurisdiction over Blocks 1 and 2 of the Egeler Correctional Facility, Blocks 9 and 10 of the Parnall Correctional Facility, and Building C. Plaintiffs argue, and we agree, that the injunction clearly states that it applies only to Blocks 1, 2, and 3 of Egeler, Block 7 of the Reception Complex and Block 8 of Parnall. *See* Injunction, Feb. 25, 2003 at 2. Accordingly, the only question is whether the district court properly exercised jurisdiction over Blocks 1 and 2 of Egeler.

The Consent Decree stated the following:

This was an action brought pursuant to 42 U.S.C. § 1983 and other applicable statutes seeking declaratory and equitable relief with respect to the conditions of confinement at the Central Complex of the State Prison of Southern Michigan, including the Reception and Guidance Center (hereinafter referred to as SPSM-CC).

---

[5]Defendants also argue that the district court abused its discretion by relying upon certain exhibits in violation of the Federal Rules of Evidence. We disagree and find that any conceivable error in connection with those exhibits is harmless.

Consent Decree. At the time of the entry of the Consent Decree, April 1985, SPSM-CC consisted of Blocks 3-6, 8, 11, 12, and Administrative Segregation. Blocks 1 and 2, on the other hand, were part of the North Complex. Nevertheless, as stated above, at that time, the *Hadix* facilities were defined as "all areas within walls of the State Prison of Southern Michigan at the time this cause commenced and all areas which will supply support services under the provisions of the Consent Judgment." Order Accepting Consent Judgment, May 13, 1985. The "within walls of the State Prison of Southern Michigan" meant the Central Complex. Accordingly, the question is whether Blocks 1 and 2 are "areas which will supply support services." The district court concluded that "those facilities have been long considered by this Court and Judge Feikens[6] as *Hadix* facilities given the delivery of support services. While, of course, the delivery of support services may change over time, there is no need on the present record to declare those facilities as non-*Hadix* facilities." *Hadix v. Johnson*, No. 4:92-CV-110, slip op. at 4 (W.D. Mich. Apr. 18, 2002) (ruling on the motions). Defendants have presented us with no arguments on this appeal as to why it was an abuse of discretion to conclude that Blocks 1 and 2 are "areas which will supply support services."[7] Accordingly, we find that the district court judge

---

[6]Judge Feikens of the Eastern District of Michigan was involved with portions of this case prior to their transfer to the Western District of Michigan.

[7]We also note that in order for a district court to have jurisdiction over Blocks 1 and 2 , there must be a finding of on-going constitutional violations taking place there. Therefore, Defendants' concerns would have had more substance prior to the enactment of PLRA in 1996, when the jurisdiction was based solely on the Consent Decree. Since the PLRA requires a continuing constitutional violation for the retention of jurisdiction, even were we to find that the district court abused its discretion in exercising jurisdiction over those facilities by misconstruing the Consent Decree, Plaintiffs could immediately file a new lawsuit challenging the constitutionality of prison conditions in Blocks 1 and 2. We would like to avoid that result in the interest of judicial efficiency.

did not abuse its discretion in exercising jurisdiction over all of the facilities in question.

## II. *Constitutional violation*

### A. **District Court Proceedings**

On February 18, 2000, the district court issued its Findings of Fact and Conclusions of Law in which it stated:

Egeler cells cannot be remotely unlocked. Moreover, in an emergency prisoners would be required to exit down five stories through narrow galleries with low railings. In a fire, water flowing over the galleries from the affected sprinklers would make some areas more slippery, and in some areas smoke from the fire might also increase the hazard. This combination of circumstances would pose an extremely great fire hazard. . . The hazards of a fire evacuation would be even greater for a prisoner with medical disabilities, a category that includes much of the population. . . Fire safety hazards are exacerbated for those persons with significant medical disabilities, if they are inappropriately housed on an upper tier. Defendants did not contest Plaintiffs' contentions that fire safety in relation to prisoners with medical and mental health problems is deficient. Defendants' failures to implement an appropriate break-up plan, or otherwise address the dangers at the Egeler facility, have resulted in current and ongoing constitutional violations. The current record also supports a conclusion that there is an ongoing constitutional violation regarding Administrative Segregation.

*Hadix v. Johnson*, 2002 U.S. Dist. LEXIS 21283, at *376-77 (W.D. Mich. Oct. 29, 2002) (citing its previous Findings of Fact and Conclusions of Law). Since this order was not final, it was not appealed. The court also set a May 2002 hearing regarding fire safety to provide Defendants an opportunity to

prove they have taken actions that have remedied constitutional violations previously determined and to discuss plans to remedy these violations in Egeler and Administrative Segregation. Defendants submitted a Report of their Remedial Plans for Fire Safety, Temperature, Ventilation and Facility A on June 8, 2001.

Section VIII of the original Consent Decree called for a management study. This study concluded that SPSM was unmanageable and should be broken into smaller facilities for purposes of management. The parties negotiated two stipulations, each of which was approved by the Court. The Stipulation Regarding Implementation of Consent Decree Provisions VIII, E, F, and G, April 7, 1989, established basic procedures. The Stipulated Agreement Regarding Plan Element One and the Implementation of Paragraphs VIII, E, F, and G of the Consent Judgment, June 8, 1990, called for the unitization and compartmentalization of each of the SPSM cell blocks into four parts. The Agreement also stated that:

The parties agree that unitization and decentralization are critical to the acceptance of Plan Element One. Unitization has been recommended by the Defendants in their binding proposals to include "dividing each cellblock into four smaller living units which will operate as a management unit." Decentralization has been recommended by Defendants in their binding proposals to include "food service and passive recreational programming . . . decentralized to each of the unitized housing units." Where Defendants condition implementation of these proposals with expressions such as "if possible" or "where possible" this condition relates to *architectural feasibility*.

June 8, 1990 Stipulated Agreement. Our reading of the record indicates that Defendants consented to compartmentalization as a remedy not for the fire safety concerns, but for the concerns over violent attacks that were taking place in the prison complex. The concerns about

personal safety of the prisoners stemming from the potential of outbreak of violence have been remedied and are not subject of the current appeal. Accordingly, the district court erred when it proceeded on the assumption that Defendants had agreed on an earlier occasion to compartmentalization of the facilities to remedy fire safety violations.

The question of architectural feasibility thus became crucial to the proper resolution of this long-standing conflict. Defendants retained the architectural and engineering firms of Rosser Fabrap and Silver Ziskind to assess the physical and functional conditions of the *Hadix* facilities and design the necessary corrective actions in accordance with the Stipulated Order to unitize and compartmentalize the facilities. Robert Fabrap found, *inter alia*, that (1) all of the cell blocks at Egeler violate the "means of egress" requirements of the code of the Building Officials and Code Administrators, International ("BOCA Code");[8] (2) the stairs that would be used for evacuating the cell blocks in Egeler are inadequate in size, enclosure, location, and discharge; and (3) the five-story mezzanine design in the Egeler cell blocks violates the atrium requirements of the BOCA Code. These findings were accepted by Defendants' mechanical engineering expert, David Sproul.

Additionally, Defendants retained Mr. Wayne Carson as their fire safety expert. Mr. Carson visited the *Hadix* facilities on a number of occasions, both before and after issuing his report. During those visits, Mr. Carson walked through the facilities and interviewed the staff. Mr. Carson opined that MDOC was conducting fire drills quarterly on each shift. The examination of the drill reports showed that evacuation times in Block 3 and Block 8 approached twenty minutes. The Life

---

[8] The BOCA Code is issued by the International Code Council and is adopted by various jurisdictions. As of the date of this opinion, the Code has been adopted by 44 states, including Michigan. It provides safety requirements for newly-constructed or remodeled buildings, but not for existing structures.

Safety Code ("LSC")[9] does not specify the maximum amount of time to complete an evacuation. It does, however, require that where a large atrium area (e.g. cell block) is being used to dilute smoke as Defendants argue,[10] the evacuation time must be considered in designing a smoke management system. Depending on the cell block, between 22 and 27 locks must be opened at Egeler. By contrast, the LSC permits a maximum of 10 locks. Further delaying the evacuation is the operating procedure, which mandates that a staff member must travel to the arsenal to get the key to activate smoke evacuation vents. Nevertheless, Mr. Carson opined at the 2002 hearing that MDOC's evacuation procedures and fire drills are adequate to meet the requirements of the LSC. His opinion rested in large part on the ability of the open cell blocks to provide a large volume for the dilution of heat and smoke. Undermining that conclusion was Mr. Carson's inability to tell the court how quickly smoke would actually

---

[9] The Life Safety Code is promulgated by the National Fire Protection Association and is adopted by various jurisdictions, including Michigan. The purpose of the Life Safety Code is to establish minimum requirements that will provide a reasonable degree of safety from fire in existing buildings and structures.

[10] Mr. Carson presented the following example during his testimony: If I bring a phone booth into this courtroom and walk in and close the door and set the phone book on fire, I'm not going to be able to stay in the phone booth very long because of the heat and smoke buildup in the booth. But if I light the same phone book in the middle of the courtroom, we could stay in here and watch it burn because we have a large volume to absorb the heat and smoke. The cell blocks, because they are so large, some of them longer than a football field provide a huge volume to absorb heat and smoke and is also limited fuel source in the cell block and the fuel is what drives the fire, that's what produces the heat and smoke is the things that burn, and there is limited fuel in the cells and in the block to burn, so we have a limited size fire and this huge volume, it's a tremendous safety factor. *Hadix*, 2002 U.S. Dist. Lexis 21283, at *382-83 (W.D. Mich. Oct. 29, 2002).

disperse to fill the whole cellblock.[11] Mr. Carson also did not know in what directions the smoke would travel from a fire. On the other hand, Mr. DiMascio opined that the most likely path that smoke would travel would be upward, spreading out as it rose and then traveling across the ceilings. Mr. DiMascio's theory was confirmed by the actual path of the smoke from a fire in Block 8 that Mr. Kovaleski witnessed on an earlier occasion. However, the district court acknowledged that fire and smoke from a fire do not travel in the same direction or have the same characteristics on every occasion. Mr. Carson attempted to bolster his smoke dilution theory by testifying that his research has only disclosed one multi-tiered open cell block fire in Ohio in the 1930s, which resulted in death or injury to prisoners when the wooden roof collapsed. Plaintiffs countered that aspect of his testimony with Curtiss Pulitzer's testimony that a number of fires had taken place in multi-tier cell blocks.[12] Despite Mr. Pulitzer's statement regarding the loss of life due to fires in multi-tiered correctional facilities 20-25 years ago, the court noted that the

---

[11]The LSC does provide examples of doing calculations for smoke removal rates based on assumed fuel loads. The type and amount of fuel load drives both how fast a fire will develop and how long the fire will last. The LSC uses an example of a severe fuel loading of 6 pounds per square foot. Mr. Carson testified that the approximate weight of the cell furnishings is 1.7 pounds per square foot. Mr. DiMascio, Plaintiffs' expert, did not contradict that testimony through his own calculations. Mr. DiMascio did indicate that Mr. Carson may have underestimated the fuel load by only taking into consideration cell furnishings, typically-issued clothing, and bedding. The importance of other combustible property, such as personal and legal materials, was provided by Plaintiff Ronald Kovaleski, who estimated the weight of his property at about 500 pounds and the property of a typical prisoner at about 250 pounds. Mr. Kovaleski's experience therefore illustrates the failure of MDOC to enforce its policy limiting the amount of personal property an inmate may possess within their cell.

[12]Mr. Pulitzer is a planner and a licensed architect with over twenty years experience in the planning of correctional facilities.

most recent correctional facility to have a fire resulting in loss of life was not multi-tiered.

With respect to a likelihood of a fire, Mr. Carson opined that (1) the combustible materials in the cell blocks are limited,[13] (2) there are no combustibles stored in the basement of the cell blocks; (3) there are metal fans in the corners of the units and sprinklers over the metal fans; (4) the structure is noncombustible[14] and there is nothing in the basement that is combustible; (5) there are no combustible materials in the attic space; (6) the laundry levels at the bulkheads referred to as the ends of the cell blocks at the Egeler Facility are protected with sprinklers; and (7) all buildings are protected by automatic sprinklers in each cell. On cross-examination, Mr. Carson conceded that the dry transformers and circuit breaker panels in Block 7 and 8 could catch fire and that smoke from the fire could enter the cell block. Mr. DiMascio confirmed that the dry transformers and circuit breaker panels in Blocks 1-3, 7, 8 are "live" and pose a serious hazard if they were to catch on fire. Mr. DiMascio testified that "sprinkler systems fail too often." However, he was unable to provide the court with the failure rate, if any, of the sprinkler system in the subject facilities.

Plaintiffs produced evidence, credited by the district court, that there are no automatic sprinklers in the basements of Blocks 1, 2, 3, 7, and 8 (except at either end over the fans) and that there are no sprinklers in the pipe chases behind the cells in Blocks 7 and 8. As a result, if smoke gets into the pipe chases in Blocks 7 and 8, it would travel vertically through the tiers, get to the return air vents at the top of the

---

[13]Mr. Carson indicated that (1) the bed, desk and chair are metal except for the chair's plastic molded back; (2) the furnishings are metal; and (3) the mattress is cotton, treated with boric acid–it is combustible but has been treated to reduce its flammability.

[14]Mr. Carson indicated that all Blocks were "heavy concrete and masonry construction."

building and be exhausted. The smoke detectors in the air handling units would shut down the unit in the event of large volumes of smoke. At that point, the smoke would not be recirculated in the building; nor would it be exhausted. Mr. Carson discounted the dangers presented by the lack of sprinklers in the pipe chases of Blocks 7 and 8 because there is no fuel in the pipe chases. He concluded that Blocks 1, 2, 3, 7, and 8 are fully sprinkled within the intent of the LSC.[15] He also opined that the Blocks provide an equivalent level of protection intended by the Code.[16]

A major point of contention during the trial was whether or not Blocks 1-3 and 7-8 are single-story or multi-storied for the purposes of the LSC. Those Blocks are each five stories tall and the length of a football field. Mr. Carson opined that the Blocks are single-story for purposes of the LSC. Mr. DiMascio, and the district court, disagreed. The district court further found that even if the claim that these Blocks are one-story buildings is accepted, Defendants would then be violating a separate code provision–the requirement that ceiling height not exceed twenty-three feet.[17]

Another point of contention was the applicability of BOCA to these facilities. BOCA requires more safety precautions than does the LSC. Mr. Carson, who is involved with BOCA and is a member of BOCA, stated that BOCA is not applicable to the subject facilities because BOCA only applies to new construction and remodeling, and not to existing structures. The district court noted that Blocks 1-5 were

---

[15]Mr. Carson was on the committee that drafted Section 15-3.1.3 of the LSC. The purpose and intent of that Section was to address fire safety in existing large multi-tiered open cell blocks.

[16]The LSC has an equivalency provision to allow the authority enforcing the Code to make judgments concerning its application.

[17]The ceiling height in the cellblocks varies between 42 feet in Egeler and 51 feet in 7 and 8 Block.

constructed in 1926. Blocks 7-8 were constructed in 1928. Blocks 11-12 were constructed in 1944. Administrative Segregation was constructed in 1930. The court concluded that as a renovated facility, Egeler was subject to BOCA.

Mr. Carson also acknowledged that he did not take into consideration the number of prisoners with medical problems. However, he indicated that a problem of occupants with medical problems exists in all facilities, including the private sector and that the LSC takes this problem into consideration. The court disagreed because it found that *Hadix* facilities house a very substantial numbers of inmates who, "because of age, physical impairment, medical or mental condition, or medication are more at risk from smoke than a general population and evacuate more slowly." *Hadix*, 2002 U.S. Dist. LEXIS 21283, at *411-12 (W.D. Mich. Oct. 29, 2002).

## B. District Court Conclusions

After considering all evidence the district court found the following specific fire safety deficiencies with respect to various areas of concern. With regard to building evacuation the court found that:

> If inmates cannot quickly evacuate a housing block in the event of the a serious fire, they would likely die. The current population is at risk in a fire emergency. . . According to Defendants' records, a substantial number of cell locking mechanisms do not work properly at any given time. . . In order to exit a block, an inmate must travel half the length of his tier to the nearest stairs, which are at either end of each block; travel down as many as five flights of open stairs;[18] and cross the open area on base to the exit. The distance an inmate must

---

[18]The blocks in question have five tiers. It therefore appears to this court that there are only four flights of stairs that an inmate must travel unless the exit is below the first floor.

travel in 1-3 Blocks and 7-8 Blocks to exit the block exceeds the maximum travel distance of 150 feet permitted by the Life Safety Code. Blocks 1, 2, 3, 7, and 8 cannot be classified as one-story buildings under the Life Safety Code because they are not fully sprinkled. "Fully sprinkled" is an absolute without exceptions for unsprinkled areas. The BOCA Code would not permit a five-tiered cell blocks such as those at Egeler and Parnall. The primary concern associated with Blocks 1-3, 7 and 8 is that they are five-tiered open celled structures. In addition to applying to new or renovated structures, the BOCA code requires that unsafe structures be taken down or made safe. Blocks 1-3, Administrative Segregation, and Blocks 7-8 are unsafe and should be corrected. Application of the BOCA Code to Blocks 1-3, 7 and 8 is essential if the buildings are to be made safe. The ceiling height in Blocks 1-3, 7 and 8 is 51 feet. The BOCA Code permits a ceiling height that does not exceed 23 feet long, only so long as one of the exits does not require inmates to traverse stairs from higher than the 23 feet. The BOCA ceiling height requirement serves to reduce the number of people at risk. The intent of the ceiling height requirement is to assure compartmentalization, reducing the population at risk from a fire in a particular unit and assuring that prisoners can move horizontally to the next unit in the event of fire, rather than being required to negotiate distances in excess of what is permitted by the code.

*Hadix*, 2002 U.S. Dist. LEXIS 21283, at *400-03 (W.D. Mich. Oct. 29, 2002).

With respect to smoke removal, the district court found that:

Notwithstanding MDOC regulations, there is a sufficient fuel load within a cell to burn for 15 minutes. Some cells have footlockers full of books and other papers. Smoke caused by a fire in a cell would be most likely to rise

from the cell on fire and, as it rose from gallery to gallery, it would gather air and expand, affecting more cells. When the smoke reached the top of the block, it would move horizontally through the block and then downward into the block. The air space in a housing block above the occupied cells will act as a reservoir for smoke but it would be of limited use before it began affecting inmates trying to use upper galleries to exit. Smoke will also form eddies in areas that inmates on other levels are trying to use as exits. Mr. DiMascio made calculations based on Life Safety Code, indicating that each block in Egeler would need to be able to evacuate 150,000 cubic feet per minute ("CFM") of smoke from a block. The ventilation fans are rated to evacuate 20,000 CFM . . . Accordingly, under conditions in a fire as anticipated under the Code, the cell block could fill with smoke at the rate of ten feet per minute. In light of the fact that the ceiling height in Blocks 1-3, 7 and 8 is 51 feet, these calculations imply that smoke from the bottom tier could reach the top tier in approximately five minutes. However, the chances of such a fire are reduced by the presence of sprinklers. The ventilation system in 1-3, 7 and 8 Blocks is no more than an add-on. It is not a smoke controlled system as described in the codes. There are "live" dry transformers and electric breaker panels in the basements of 1-3, 7 and 8 Blocks. These can catch fire and the smoke generated can travel into the housing area. There are no sprinklers in the basements. Mr. Carson agreed with these statements as to 7 and 8 Blocks. Fire drill reports from Block 3 of Egeler show evacuation times ranging from eight minutes to eighteen minutes. The reports for Block 8 evacuation times range from three minutes to twenty minutes. However, the codes do not specify maximum evacuation times. It takes four minutes just to unlock all of the cells in Blocks 7 and 8, not counting the time from the base level through an exit door.

*Id.* at *403-06.

In addition to these general findings, the district court identified physical problems unique to each facility in question. With respect to Egeler, the court noted that:

A maximum of ten locks can be released to meet the Life Safety Code. Two of the Egeler blocks have 22 locks that must be manually opened to evacuate the building. One block has 27 locks that must be manually opened, because there are five top-lock cells. The smoke-purging system in each block of Egeler is the roof exhaust fans. To activate those fans, staff must go to the Arsenal to retrieve the key to the lock on the exhaust fans. In the event of a fire, staff would be expected to unlock cells and the exit doors, travel back and forth from the Arsenal to get the key to unlock the switch to the smoke purging system, and assist handicapped inmates. A Block 2 cell (which was subject to double-bunked [sic] at the time of hearing) has a distance of 18.5 inches between the bunk bed and the side-by-side lockers opposite the bed, 22 inches from the sink to the bunk bed and 9.5 inches from the sink to the desk, not including the space for the chair. Defendants did not made any changes to the ventilation system in 2 Block after it was double-bunked, nor have Defendants made any changes in the ventilation since the Court made its findings of unconstitutionality, with the exception of increasing the population by double-celling for a time. This double-bunking placed Block 2 prisoners at risk in a fire emergency.

*Id*. at *406-07. With respect to Blocks 7 and 8, the court noted that:

The quartermaster area of 7 Block contains substantial flammable materials. Smoke could get into the housing unit up the stairs or through the passageway used by inmates to get into the cell block. [Plaintiff] Kovaleski estimated that inmates have substantial weights of flammable materials in their cells. . . Mr. Kovaleski described a fire that was set by an inmate on the first

gallery of 8 Block. The inmate put a few papers and a sheet in a trash can, ignited this material and placed his mattress over the fire. Mr. Kovaleski was on the third gallery at the time. There was so much smoke produced by this fire that he could not see the cell opposite his on the other side of the common area. The smoke came up the front of the tiers and into his cells. . . There are no sprinklers in the 7 and 8 Block pipe chases. If an inmate in 7 or 8 block were to ignite his possessions, the smoke from the fire could travel into the pipe chase, which does not have sprinklers, and travel up in the chases and enter the cells at higher levels. If transformers in the 7 and 8 Block basements caught fire, the smoke from the fire could travel into the housing units.

*Id.* at 407-09. With respect to Administrative Segregation, the court concluded that "[i]f a fire started in a basement it could ignite the insulation at each floor" and that "Defendants inappropriately rely on this ventilation system to exhaust smoke in Administrative Segregation." *Id.* With respect to RGC, the court noted that "[i]nmates in RGS may never participate in a fire drill, because of the short period of time they are in the facility [10 days to 4 weeks], placing them at increased risk." *Id.* It further concluded that "in the Egeler facility, Blocks 7 and 8, Administrative Segregation and RGC, the risk of injury from smoke and fire for prisoners with disabilities and chronic diseases continues to violate Constitutional requirements . . ." *Id.* at 412-13.

C. **Current Appeal**

In the context of prison conditions, the Cruel and Unusual Punishment Clause forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime. . ." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). To succeed in an Eighth Amendment challenge, Plaintiff must establish that (1) a single, identifiable necessity of civilized human existence is being denied (objective prong) and (2) the defendant prison

official acted with a sufficiently culpable state of mind. *See, e.g., Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000).

With respect to the objective prong,"[p]risoners have the right not to be subjected to the unreasonable threat of injury or death by fire . . .." *Hoptowit v. Spellman*, 753 F.2d 779, 783-84 (9th Cir. 1985). The contemporary standards of civilized decency that currently prevail in society determine whether conditions of confinement are cruel and unusual. *See Rhodes v. Chapman*, 452 U.S. at 346. It is those contemporary standards, and not courts' own "notions of enlighted policy" that are controlling. *Tillery v. Owens*, 907 F.2d 418, 426 (3rd Cir. 1990). To satisfy this prong, "extreme deprivations are required . . .," *Hudson v. McMillan*, 503 U.S. 1, 9 (1992), and only deprivations denying "the minimal civilized measure of life's necessities" are grave enough to create a violation of the Cruel and Unusual Punishment Clause. *Rhodes*, 452 U.S. at 347. Harsh and uncomfortable prison conditions do not automatically create such a violation. *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)). However, a "remedy for unsafe conditions need not await a tragic event." *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993). *See also Hill v. Marshall*, 962 F.2d 1209, 1211, 1215 (6th Cir. 1992) (holding that failure to provide prophylactic medication to prevent the possible future development of active tuberculosis is "actual injury," even though prisoner did not develop active tuberculosis).

With respect to the subjective prong, there is no violation of the Eighth Amendment unless the defendant is "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists" and he draws "that inference." *Farmer*, 511 U.S. at 837. Even if the defendant draws such an inference, he is not liable if he took reasonable steps to avert the harm. *Id.* at 844. Negligent exposure to a risk is not sufficient to create an Eighth Amendment violation. *Id.* at 835-36. Rather, deliberate indifference can

best be compared to criminal law's "subjective recklessness." *Id.* at 839-40. In *Farmer*, the Court, concerned with the subjective component, explained that an "inmate seeking an injunction on the ground that there is a contemporary violation of a nature likely to continue must adequately plead such a violation; to survive summary judgment, he must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so . . ." *Farmer*, 511 U.S. at 845-46. In this case, we are concerned with future conduct to correct prison conditions. If those conditions are found to be objectively unconstitutional, then that finding would also satisfy the subjective prong because the same information that would lead to the court's conclusion was available to the prison officials.

The district court concluded that Plaintiffs established both the objective and the subjective prongs. The review in this case is made difficult because the district court's finding of a constitutional violation with respect to fire safety was first made in 2000, together with a number of issues which have since been resolved. However, since no injunction was issued at the time, no appeal was available. The present injunction was issued after a further evidentiary hearing held in 2002, where expert testimony was offered by each party as to compliance with fire safety codes and current conditions with respect to fire safety. In making its findings supporting the injunction, the district court incorporated its principal findings of its 2000 opinion finding fire safety conditions in the affected buildings unconstitutional.

Defendants have not attacked any of those factual findings as clearly erroneous. Indeed, the only fact that they appear to be challenging is the district court's finding that a large percentage of the prisoners in the general prison population have health problems that would affect their ability to deal with smoke from possible fires. However, Defendants fail to

provide any record to support their position while Plaintiffs direct us to various exhibits and disclosures.

Defendants do argue that their expert, Mr. Carson, is better qualified than plaintiff's expert, Mr. DiMascio. Mr. Carson testified that the LSC properly applies to these existing buildings and not the BOCA Code, and that the buildings substantially comply with the LSC even though the distance that must be traveled to stairs exceeds the distance permitted under the Code and even though there is an insufficient exhaust system. This deficiency, Mr. Carson stated, was compensated for by the large space of the building which would dissipate smoke from a limited fire in a prisoner's cell. Mr. Carson, however, gave no calculations as to what time that would take or how much smoke could be handled. On the other hand, Plaintiffs' expert calculated that the space was insufficient to dissipate the amount of smoke that could result from a fire in a cell, considering the amount of papers a prisoner could accumulate in his cell. Plaintiffs' expert also called attention to areas of the buildings which were not fully sprinkled. However, sprinklers were installed in certain areas, both after Plaintiffs' expert's inspection and since the hearing. Furthermore, some of the hazards (e.g. unused transformers) have been or are in the process of being removed.[19] If we were satisfied that the district court applied a proper standard in its analysis, we would defer to its judgment about the credibility of the conflicting witnesses.

We reserve our judgment on the battle of the experts, however, because the district court does not, in either its 2000 or 2002 order, state the standard it is applying to find that the conditions relating to fire prevention and fire safety are inadequate. It does not state in what particular ways Defendants' deficiencies were unconstitutional in 2002, merely reciting that it had found those conditions unconstitutional in 2000 and that they had not been remedied.

---

[19] The parties stipulated that these changes have taken place.

It is unclear whether the court simply (and erroneously) concluded that the violation of the LSC or the BOCA is equivalent to a constitutional violation. Having reviewed the evidence before us, we conclude that the court abused its discretion when it found that the current prison conditions at the facilities in question are so unsafe as to violate the Constitution and when it issued an injunction requiring compartmentalization.

The Fifth Circuit encountered a similar problem with fire safety concerns in various institutions operated by the Texas Department of Corrections ("TDC"). *Ruiz v. Estelle*, 679 F.2d 1115 (5th Cir. 1982). In *Ruiz*, the district court found that (1) the TDC prisons were woefully deficient in the number of fire exits, (2) the few available exits in the housing areas were too small and inadequately constructed to serve effectively during an actual fire, and (3) a similar problem in work areas created a potential for serious injury in the face of a disaster. Concluding that these conditions violated the Eighth Amendment, the district court ordered TDC to comply with the current edition of the Life Safety Code of the National Fire Protection Association. *Id*. at 1152-53. On the other hand, the record contained "no evidence either of a single fatality or a serious injury at TDC caused by fire or smoke inhalation in the recent past. Although there is danger from inflammable materials used inside the buildings, the buildings themselves are built of materials that do not burn easily." *Id*. at 1153. The Fifth Circuit acknowledged that TDC had a duty to provide adequate fire safety for its inmates. Nevertheless, it found that:

The deficiencies in fire safety found at TDC, however, do not constitute cruel and unusual punishment, either alone or in combination with the other conditions in its prisons. Indeed, the fire safety problems have little connection with the other conditions found to violate the eighth amendment. *Moreover, although the standards set by private organizations' safety codes may be instructive in certain cases, they simply do not establish*

*the constitutional minima; rather they establish goals recommended by the organization in question.*

*Id.* (citations omitted) (emphasis added). In finding that private safety codes, such as the LSC, do not establish the constitutional minima, the Fifth Circuit relied on the following footnote in a Supreme Court's opinion:

Respondents and the District Court erred in assuming that opinions of experts as to desirable prison conditions suffice to establish contemporary standards of decency. As we noted in [an earlier case], such opinions may be helpful and relevant with respect to some questions, but they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question. Indeed, generalized opinions of experts cannot weigh as heavily in determining contemporary standards of decency as the public attitude toward a given sanction. We could agree that double celling is not desirable, especially in view of the size of these cells. But there is no evidence in this case that double celling is viewed generally as violating decency.

*Rhodes*, 452 U.S. at 348 n. 13 (citations omitted). The Supreme Court more recently reiterated its commitment to "contemporary standards of decency" approach to claims of alleged Eighth Amendment violations:

[D]etermining whether McKinney's conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he

complains is not one that today's society chooses to tolerate.

*Helling*, 509 U.S. at 36. A review of cases dealing with fire safety in the constitutional context illustrates a continuum of various violations of fire safety, generally, and fire safety codes, specifically. Some of these amounted to a constitutional violation while others did not.[20] *See generally Women Prisoners of the Dist. of Columbia Dep't of Corr.*, 877 F. Supp. 634, 669 (D.D.C. 1994) (finding that the following living conditions, working in concert, presented a risk of fire so serious that it violated contemporary standards of decency where (1) the dormitories were overcrowded and carried a heavy combustible load; (2) the walls could not contain a fire within any room; (3) only one fire exit consistently remained unlocked; (4) there was no fire alarm system; (5) there was no sprinkler system; and (6) fire drills were not regularly conducted); *Carty v. Farrelly*, 957 F. Supp. 727, 737 (D.V.I. 1997) (finding a constitutional violation where (1) the cell locking devices, manual alarm systems, smoke dampers, and heat detectors were inoperable, thereby creating a security risk during a fire emergency, and (2) the building itself could not adequately protect the occupants during a fire because of an inadequate fire alarm system); *Toussaint v. McCarthy*, 597 F. Supp. 1388, 1410 (N.D. Cal. 1984) (finding an Eighth Amendment violation where (1) lockup units at both prisons were replete with fire hazards; (2) evacuation procedures were nonexistent or, at best, untested; and (3) the record showed that multiple fire-related fatalities occurred); *Capps v. Atiyeh*, 559 F. Supp. 894, 915 (D. Or. 1983) (finding an Eighth Amendment violation despite the absence of evidence of a death or serious injury cause by fire or smoke inhalation at the facility because (1)

---

[20]The citations that follow represent this continuum. The cases are listed in the order of the seriousness of the constitutional violations alleged, and/or proven, therein, from the more serious (and, hence, unconstitutional) conditions to the less serious ones.

the prison was a very old structure unlike solid concrete complexes approved by *Ruiz*; (2) the inmates, many of whom are older, lived in crowded dormitories; (3) the facility needed either smoke detectors or a fire alarm system, and an emergency exit on the north end of the building; (4) the south emergency exit was locked and only one guard could unlock it; and (5) the ladder did not reach the ground); *Leeds v. Watson*, 630 F.2d 674, 675-76 (9th Cir. 1980) (remanding for further hearing on the adequacy of the plan to remedy constitutional violations where (1) "there is room for the belief that the second floor of the facility could still be a death trap in the event of fire" because the only exit for inmates may be blocked by fire and the alternative means of regress would take too much time; and (2) "[t]here is still some possibility, moreover, that persons will be housed in 'grave emergencies' in a locked cell area that has no fire exit."); *Santana v. Collazo*, 714 F.2d 1172, 1182-83 (1st Cir. 1983) (remanding because the district court failed to adequately address "the evidence presented to it that conditions at Mayaquez are not as safe from the danger of fire as the constitution requires that they be" where (1) the polyurethane mattresses were used throughout the institution and that polyurethane is highly inflammable, burns quickly at high temperatures and emits extremely toxic gasses; (2) two juveniles actually died several years ago in a fire that they set to their mattresses; (3) fire extinguishers may not have been properly changed; and (4) there was a need for an evacuation plan in the event of fire); *Masonoff v. DuBois*, 899 F. Supp. 782, 798-99 (D. Mass. 1995) (finding that there is a triable issue concerning the plaintiffs' fire hazard claim where (1) it was undisputed that the prison lacked automatic locks on the cell doors and a functioning sprinkler system and (2) that the state building code applicable to the prison required a sprinkler system and encouraged the use of automatic door locks, but (3) where the prison may have mitigated any danger to withstand constitutional scrutiny when it implemented rigorous fire safety procedures, including evacuation drills, fire drills and inspections of fire safety equipment); *French v. Owens*, 777 F.2d 1250, 1257 (7th Cir.

1986) (observing that "[t]he eighth amendment does not constitutionalize the Indiana Fire Code. Nor does it require complete compliance with the numerous OSHA regulations" and remanding to the district court to order only those remedies that are necessary to bring conditions above constitutional minima); *Miles v. Bell*, 621 F. Supp. 51, 64-5 (D. Conn. 1985) (no constitutional violation even though the laundry room door in prison was not a one-hour fire resistant door, as required by the LSC).

In this case, the district court failed to identify the point at which certain fire safety deficiencies ceased being mere deficiencies and, instead, became constitutional violations. As noted above, this Court was informed at oral argument that Defendants have taken steps to remedy some of the problems noted by the district court, such as removing the dry transformers from the basement and installing additional sprinklers. It is unclear to us whether those remedies are sufficient to cure the constitutional violations at the *Hadix* facilities.

We understand that the judicial supervision over prison conditions is a daunting task. We cannot, however, accept the approach taken by the district court in this case, namely, providing a laundry list of all the things that were wrong in the *Hadix* facilities, declaring a constitutional violation, and ordering a highly expensive, and potentially ineffective,[21] solution. This approach renders it impossible for this Court to review on appeal the legal conclusions of the lower court. We owe deference to the district court's decision to issue an injunction to remedy the constitutional violations. However, we must review *de novo* its legal conclusion that there were constitutional violations. Absence of a clear constitutional

---

[21]This Court has no evidence before it to explain the use of compartmentalization as a fire safety remedy. Nor was one provided to us by the counsel during the oral argument despite being asked by the bench.

analysis in the present case by the lower court renders this task impossible. Accordingly, we remand this case for a more detailed analysis of how the current conditions in the *Hadix* facilities continue to be deprivations denying "the minimal civilized measure of life's necessities" rather than potentially minor deviations that may satisfy the equivalency provisions of the LSC. Also, we remand for a more detailed analysis of why the steps taken by the prison officials, which the lower court may disagree with, constitute "deliberate indifference," rather than a mere difference of opinion.

## CONCLUSION

For the foregoing reasons, we conclude that the district court properly exercised jurisdiction over all facilities in question. However, we remand for a more detailed constitutional analysis on the question of fire safety violations.