*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0043P (6th Cir.)
File Name: 04a0043p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CAROLYN GRAHAM, as
Personal Representative of the
Estate of Terance Anthony
Graham,
    *Plaintiff-Appellant,*

    *v.*

COUNTY OF WASHTENAW,
    *Defendant-Appellee.*

No. 02-1614

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-72195—Anna Diggs Taylor, District Judge.

Argued: October 23, 2003

Decided and Filed: February 10, 2004

Before: KEITH, MARTIN, and SUTTON, Circuit Judges.

---

## COUNSEL

**ARGUED:** Hugh M. Davis, Jr., CONSTITUTIONAL
LITIGATION ASSOCIATES, Detroit, Michigan, for
Appellant. Cynthia L. Reach, REACH, RANNEY &

CARPENTER, Ann Arbor, Michigan, for Appellee.
**ON BRIEF:** Hugh M. Davis, Jr., CONSTITUTIONAL
LITIGATION ASSOCIATES, Detroit, Michigan, for
Appellant. Cynthia L. Reach, REACH, RANNEY &
CARPENTER, Ann Arbor, Michigan, for Appellee.

---

## OPINION

---

BOYCE F. MARTIN, JR., Circuit Judge. This case arises
from the tragic death of Terance Anthony Graham.[1] Mr.
Graham died in police custody shortly after secretly ingesting
large quantities of cocaine upon being arrested for an
unrelated marijuana offense. Carolyn Graham, the personal
representative of Mr. Graham's estate, sued Washtenaw
County pursuant to 42 U.S.C. § 1983, claiming that the
County's policy regarding the provision of medical care to
prisoners in the County jail contributed to Mr. Graham's
death. The district court granted the County's motion for
summary judgment. For the following reasons, we affirm.

### I. BACKGROUND

The facts giving rise to this case are, for the most part,
undisputed. On May 6, 2000, at approximately 8:39 in the
evening, Deputy Sinks arrested Mr. Graham for possession of
marijuana. A few minutes after the arrest, the deputy
permitted Mr. Graham to go behind a tree, allegedly to relieve
himself. It was later determined that while behind the tree
Mr. Graham had swallowed approximately an ounce of
cocaine, which is a felony under Michigan law. Mr. Graham
was escorted into the County jail at approximately 8:55.
Most of the events occurring inside the jail were captured on

---

[1] There is some discrepancy in the record and briefs as to the correct
spelling of Mr. Graham's first name. According to the Notice of Appeal,
however, it is spelled "Terance."

videotape. Shortly after his arrival, jail personnel observed Mr. Graham walking and acting erratically. At one point, he pulled down his pants in full view of everyone in the booking area. Jail personnel asked him several times, "What did you take?" Instead of revealing that he had ingested cocaine, Mr. Graham stated that he had smoked marijuana and drank alcohol. After witnessing Mr. Graham's erratic behavior, a deputy requested that he be medically examined.

At approximately 9:00, Tracy Lakatos, a licensed practical nurse, responded and examined Mr. Graham. Nurse Lakatos was an employee of SecureCare, Inc., a company that the County had hired to provide medical care to prisoners in the County jail. Mr. Graham told her that he had been drinking and using marijuana that evening and that he had asthma. Nurse Lakatos gave him two doses of albuterol, a medication used to treat asthma that has a known side effect of causing an accelerated heart rate. At 9:06, Nurse Lakatos and Deputy Sinks took Mr. Graham to an interview room.[2] After a blood alcohol test indicated that Mr. Graham was not intoxicated, Nurse Lakatos said that Deputy Sinks could interview Mr. Graham and she left the room at 9:11.

After providing a statement about his marijuana purchase – the event prompting his arrest – Mr. Graham was turned over to another deputy and was scheduled to be booked and then released. At this point, jail personnel observed him sweating profusely and using his shirt, which he had removed from his body, to wipe off the sweat. Jail personnel determined that he was not well enough to go through the

---

[2]In a written report, Deputy Sinks claimed that at this point Nurse Lakatos told Mr. Graham that his heart was racing at around two hundred beats per minute and asked him why his heart rate was so high. The County denies that Nurse Lakatos observed or reported that Mr. Graham's heart rate was two hundred beats per minute and claims that the deputy's report is inadmissible hearsay. This disagreement does not, however, constitute a genuine dispute of material fact that would preclude summary judgment.

booking process, so they placed him in a general population cell at 9:23.

While inside the cell, Mr. Graham admitted to a cellmate that he had ingested cocaine, but insisted that he did not want the jail personnel to find out. Statements from his cellmates indicate that while in the cell Mr. Graham "could barely talk," "was staggering," "looked sick," and "was holding his stomach and rubbing his throat." At approximately 10:00, a cellmate pounded on the plexiglass window and yelled "He's hurt!" Witnesses reported that Mr. Graham appeared to be having a seizure and that he had "a blank look on his face and his eyes were real glassy."

Nurse Lakatos responded and asked what was wrong. Again, instead of telling Nurse Lakatos the truth, Mr. Graham only said that he had swallowed some pills. Nurse Lakatos used a pulse oximeter to determine his heart rate. One cellmate observed that the pulse oximeter indicated a high heart rate, which Nurse Lakatos apparently explained was due to the marijuana. Satisfied that Mr. Graham needed no additional medical care, Nurse Lakatos left the cell at approximately 10:05.

At 10:16, Nurse Lakatos responded to another cry from a cellmate that Mr. Graham had "passed out." At this point, he was taken to the medical room in the jail building, requiring assistance from jail personnel to stay on his feet. At approximately 10:40, he began to have multiple seizures, at which point an ambulance was summoned. He was transported to a hospital emergency room a few minutes later and was pronounced dead at 11:31.

On May 12, 2000, Carolyn Graham, the personal representative of Mr. Graham's estate, filed a complaint against the County, its Sheriff and certain officers. She filed an amended complaint four days later. The claims against the Sheriff and officers were subsequently dismissed, leaving a section 1983 municipal liability claim against the County,

which is the only claim at issue in this appeal. The essence of the municipal liability claim is that the County's contract with SecureCare constituted a municipal "policy" that led to a deprivation of Mr. Graham's constitutional right to adequate medical care while in police custody. Specifically, the complaint alleges that: (1) the contract impermissibly creates a policy of "automatic deference" by jail personnel to the decisions of SecureCare staff concerning the medical treatment of prisoners; and (2) the contract improperly permits licensed practical nurses – like Nurse Lakatos – to perform duties that exceed their competence under Michigan law.

On August 3, 2001, the County filed a motion for summary judgment, which was supplemented on August 28. On October 1, the district court denied the motion without prejudice and allowed Graham additional time to conduct further discovery and to amend her complaint. She made no attempt to file an amended complaint during the allotted time. On February 4, 2002, the County renewed its motion for summary judgment and, on February 11, filed a motion for sanctions pursuant to Federal Rule of Civil Procedure 11 based upon Graham's failure to withdraw the case in light of this Court's decision in *Watkins v. Battle Creek*, 273 F.3d 682 (6th Cir. 2001). In *Watkins*, we affirmed an award of summary judgment to individual and municipal defendants in a section 1983 case arising out of the death of an individual who, like Mr. Graham, died in police custody after secretly ingesting cocaine upon his arrest. *Id.*

On February 19, without requesting leave of the district court, Graham attempted to file an amended complaint that purportedly "clarified" her claim against the County and asserted additional section 1983 claims, as well as a "medical negligence" claim against various new defendants, including SecureCare. The district court *sua sponte* rejected the attempted filing. On February 25, Graham filed a motion for leave to file the newly amended complaint.

On March 11, the district court held a hearing during which the following ruling was made from the bench:

It appears to the Court that at this time it must grant the defendant's motion for summary judgment because there is no showing of any unconstitutional custom or policy on the part of the Washtenaw County Jail which required the deliberate indifference which could have led to the plaintiff's death. Indeed any other ruling here would be extremely detrimental to prisoners who are incarcerated in Michigan jails because the presence of medical personnel is essential to their safety and their health. Unfortunately the plaintiff here, as Watkins, in his case, was the only person who knew what he had ingested, and he was asked on several occasions by the medical personnel and others, apparently, at this jail what was wrong, and he did not disclose what his medical need was. So I have to grant the motion for summary judgment in this case.

After granting the County's motion for summary judgment, the district court denied Graham's motion to file the amended complaint. Graham later filed a motion for reconsideration, which was denied on April 12. She also filed a medical malpractice action against SecureCare and other defendants in Michigan state court, which apparently is still pending.

After the completion of appellate briefing in this case, this Court decided *Weaver v. Shadoan*, 340 F.3d 398 (6th Cir. 2003), another case involving the death of an individual in police custody after secretly ingesting cocaine. In *Weaver*, we relied upon our recent decision in *Watkins* to reverse the district court's denial of summary judgment to individual defendants on the plaintiff's section 1983 claims. *Id.*

On appeal, Graham argues that the district court erred in granting summary judgment in favor of the County, in denying her motion to file an amended complaint and in

denying her motion for reconsideration. We find these arguments to be without merit.

## II. ANALYSIS

We review *de novo* the district court's grant of summary judgment in favor of the County. *Dotson v. Wilkinson*, 329 F.3d 463, 466 (6th Cir. 2003). Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether a genuine issue of material fact exists, we must draw all reasonable inferences in favor of Graham, as the nonmoving party. *Bonds v. Cox*, 20 F.3d 697, 701 (6th Cir. 1994).

### A. Section 1983 Claim

The essence of the section 1983 claim is that Mr. Graham suffered a violation of his right to adequate medical care while in custody and that the County's policy regarding the provision of medical care to its prisoners – as embodied in its contract with SecureCare – led to that constitutional violation.[3] This claim implicates the familiar principles set forth in *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). In *Monell*, the Supreme Court explained

---

[3]The parties agree that Mr. Graham had a constitutional right to adequate medical care while in the custody of the County. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). It is well established that "deliberate indifference to the serious medical needs of prisoners" constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Estelle*, 429 U.S. at 104. While the Eighth Amendment does not apply to pretrial detainees such as Graham, the Fourteenth Amendment affords pretrial detainees a due process right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

that municipal liability under section 1983 may only attach where the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained of. Thus, Graham must prove two basic elements: (1) that a constitutional violation occurred; and (2) that the County "is responsible for that violation." *Doe v. Claiborne Cty.*, 103 F.3d 495, 505-06 (6th Cir. 1996). Our decisions in *Watkins* and *Weaver*, discussed above, would be relevant to the first element – i.e., whether Mr. Graham suffered a deprivation of his constitutional right to adequate medical care.[4] We need not decide that issue, however, because we find that even assuming that a constitutional violation occurred, the County cannot be held liable for it.

A plaintiff asserting a section 1983 claim on the basis of a municipal custom or policy must "identify the policy, connect the policy to the [County] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir.), *cert. denied*, 510 U.S. 826 (1994). Graham's claim is based upon the County's contract with SecureCare, which gives SecureCare responsibility over the provision of medical care

---

[4]Our decisions in *Watkins* and *Weaver* centered upon whether *individual defendants* committed a constitutional violation by virtue of their deliberate indifference to the serious medical needs of the respective decedents. While one municipal liability claim was asserted in *Watkins*, we did not discuss in much detail the merits of that claim, explaining simply that "[i]f no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Watkins*, 273 F.3d at 687 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Thus, in light of our conclusion that none of the individual defendants had committed a constitutional violation, we held that summary judgment was properly granted on the municipal liability claim as a matter of course. *Id.* This case is different from both *Watkins* and *Weaver* in that there are no claims asserted against individual defendants; the focus is solely upon the County's liability. Therefore, despite the factual similarities between this case and *Watkins* and *Weaver*, our opinions in those cases do not automatically compel the outcome here.

to prisoners in the County jail. The County concedes that this contract constitutes a municipal "policy" within the meaning of *Monell.*

The primary issue is whether Graham has alleged sufficient facts to establish that the alleged constitutional violation happened "*because of* the execution of [the County's] policy." *Id.* (emphasis added). There must be "a direct causal link" between the policy and the alleged constitutional violation such that the County's "deliberate conduct" can be deemed the "moving force" behind the violation. *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001) (citing *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)) (quotation marks omitted); *see also Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). These stringent standards are "necessary to avoid *de facto respondeat superior* liability explicitly prohibited by *Monell*." *Doe*, 103 F.3d at 508. Applying these standards, we conclude that Graham has failed to establish the requisite causal link between the County's policy and the alleged constitutional violation.

As noted, Graham believes that two particular aspects of the contract are most problematic. First, she argues that the contract impermissibly creates a policy of "automatic deference" by jail personnel to SecureCare medical staff with respect to decisions concerning prisoners' medical treatment. According to Graham, that so-called automatic deference policy is reflected in a provision stating that SecureCare "will have the responsibility of determining whether emergency services and/or hospitalization are necessary." Additionally, she relies upon a "Medical Autonomy" standard appearing in the "SecureCare, Inc. Washtenaw County Sheriff Department Policies and Procedures Manual," which reads: "PURPOSE: To insure that members of the medical, dental and mental health staff have autonomy relative to professional judgement in their respective profession."

Graham also challenges the contract on the ground that it permits licensed practical nurses, like Nurse Lakatos, to make

some medical decisions that are beyond their competence under Michigan law. This assertion is based primarily upon an affidavit of a licensed practical nurse named Cynthia Bailey,[5] but no legal authority is cited.

Thus, the crux of Graham's argument is that the County's policy was responsible for the alleged constitutional violation in this case because "the booking deputies deferred to Nurse Lakatos" – who was unqualified under Michigan law to make certain decisions concerning Mr. Graham's treatment that the contract permitted her to make – "and retained [Mr. Graham] in a general population cell without referring him for emergency medical treatment/evaluation because of the County's policy of deference . . . ."

Contrary to Graham's assertions, we find nothing in the County's policy that is actionable under section 1983. Graham concedes that it is not unconstitutional for municipalities to hire independent medical professionals to provide on-site health care to prisoners in their jails. Nor is it unconstitutional for municipalities and their employees "to rely on medical judgments made by medical professionals

---

[5] The County claims that Bailey's affidavit, as well as the affidavits of two other individuals, were deemed inadmissible by the district court and, accordingly, should not be considered part of the record on appeal. The record contains no written district court order declaring the affidavits inadmissible, nor do the transcripts reveal a ruling from the bench to that effect. The only pronouncement by the district court on this subject is a passing statement during an oral argument in which the judge stated:

> That's all right. The Court is not going to consider those affidavits and I don't think they're helpful at any rate at this stage of events. I'm going to deny this motion without prejudice for summary judgment and give the plaintiff 60 days to attempt to rectify the things that have not been done in this case.

However, while that statement indicates the court's unwillingness to consider the affidavits at that particular time, it does not represent a definitive ruling as to the admissibility of the affidavits. Thus, it appears that the affidavits are properly part of the record on appeal.

responsible for prisoner care." *Ronayne v. Ficano*, No. 98-1135, 1998 WL 183479, at *3 (6th Cir. Mar. 15, 1999) (unpublished opinion). In fact, most would find such a policy laudable in many respects. Not only does such a policy – like the one at issue in this case – allow prisoners to receive prompt health care from on-site doctors or nurses, it also ensures that an independent party, rather than a corrections officer, makes the critical decisions about whether and at what point a prisoner's medical needs are sufficiently severe that ambulatory care or hospitalization is warranted.

Graham's argument is essentially that the County's policy did not, in this particular case, adequately address Mr. Graham's specific medical needs. That may be so.[6] However, "[t]he fact that alternative procedures might have better addressed [a prisoner's] particular needs does not show that the [County was] deliberately indifferent to his medical needs." *Id.* Even if, as Graham contends, the policy required jail personnel to defer to the medical decisions of SecureCare employees, and even if it permitted licensed practical nurses to make medical decisions that Michigan law does not permit them to make, those alleged defects are insufficient to hold the County liable for the alleged constitutional violation in this case. It is possible that Mr. Graham received medical care that fell below the applicable standard of care under Michigan law. It is even possible that the medical care that he received was so woefully inadequate as to rise to the level of

---

[6]In fact, as this and other recent cases such as *Watkins* and *Weaver* have confirmed, it is not unusual for individuals to ingest narcotics surreptitiously in an attempt to hide them from the police, and then to conceal that illegal activity while in custody – even when they become dangerously ill – out of fear of prosecution. This dangerous practice presents a significant problem for the law enforcement community. It appears that, in general, more should be done in order to ensure that arresting officers prevent, to the best of their ability, individuals from ingesting narcotics in the first place, as well as to ensure that individuals who show symptoms of a drug overdose while in custody obtain the medical care that they so urgently need, despite their possible reluctance to reveal the true nature of their condition.

a constitutional violation. But even assuming that Graham did suffer a constitutional violation, that violation "resulted from factors other than a faulty [County policy]." *City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989) (citations omitted).

There can be no municipal liability where "an otherwise sound program has occasionally been negligently administered." *Id.* at 391. The fact that individual actors may "occasionally make mistakes . . . says little about the . . . legal basis for holding the [County] liable." *Id.* Yet that is precisely the essence of Graham's claim in this case. The allegations in her complaint focus primarily upon the inadequacy of the medical treatment that was provided to Mr. Graham by SecureCare and its staff. However, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860, n.5 (6th Cir. 1976). Perhaps in recognition of the fact that her complaint is more properly remediable under state law, Graham has filed a medical malpractice lawsuit in Michigan state court against SecureCare and others arising from the same events that underlie this lawsuit.

In sum, the County instituted its policy regarding the provision of medical care to prisoners undoubtedly in an effort to improve the quality of their medical care. Even if Mr. Graham received constitutionally inadequate medical care, there is simply no evidence that the policy was the "moving force" behind that constitutional violation. *Waters*, 242 F.3d at 362. Under the circumstances presented in this case, the section 1983 claim against the County was properly dismissed.

### B. Amended Complaint

Graham also challenges the district court's denial of her motion for leave to file a proposed amended complaint, which purportedly "clarified" her municipal liability claim against the County and asserted new claims against SecureCare and Nurse Lakatos, along with Jeannette Figurel (a SecureCare medical assistant) and corrections officers Dwight Settles and Jay Klimowicz. Because her original complaint had already been properly dismissed, however, there was no complaint pending for Graham to amend. Under these circumstances, we find that the district court did not abuse its discretion in refusing to permit an amended complaint to be filed at that point.[7]

### C. Motion for Reconsideration

Finally, Graham appeals the district court's denial of her motion for reconsideration. In its written order denying the motion, the district court explained that under Eastern District of Michigan Local Rule 7.1(g)(1)-(3), "[g]enerally, and without restricting the court's discretion, the court will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the court, either expressly or by reasonable implication. The movant must not only demonstrate a palpable defect by which the court and the parties have been misled but also show that correcting the defect will result in a different disposition of the case." In the district court's view, Graham's motion for reconsideration merely raised arguments that were already ruled upon; it failed to show either a reason justifying relief from the judgment or a palpable defect by which the court was misled.

---

[7]Presumably, after the district court denied her motion for leave to file the amended complaint, Graham could have simply filed a separate lawsuit alleging the new claims (other than, of course, the section 1983 claim against the County, which was dismissed with prejudice). It is unclear why she chose not to pursue that option.

We agree with the district court's characterization of the motion and, thus, find no abuse of discretion.

### III. CONCLUSION

For the reasons discussed above, the district court's judgment is AFFIRMED.