NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0774n.06
Filed: September 1, 2005

Case No. 03-2486

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ESTATE OF RICARDO HARBIN; | ) | |
| JANICE HARBIN JOSEPH, Personal | ) | |
| Representative of Estate of | ) | |
| Ricardo Harbin, deceased, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiffs-Appellants, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| CITY OF DETROIT, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

_____

BEFORE: BATCHELDER and COLE, Circuit Judges; RUSSELL,[*] District Judge.

ALICE M. BATCHELDER, Circuit Judge. Plaintiff-Appellant Janice Harbin Joseph ("Joseph"), the representative of the estate of her deceased brother Ricardo Harbin ("Harbin"), appeals the district court's grant of summary judgment in favor of Defendant-Appellee City of Detroit ("the City") on Joseph's claim, brought under 42 U.S.C. § 1983, that the City violated Harbin's rights under the Constitution by failing to provide or secure adequate medical attention for him while he was in the custody of the Detroit Police Department ("DPD"). Because we conclude that no facts material to this claim remain in issue, and the City is entitled to judgment as a matter of law, we AFFIRM the decision of the district court.

_____

[*]The Honorable Thomas B. Russell, District Judge for the Western District of Kentucky, sitting by designation.

**I.**

Inexplicably, Joseph's complaint—at least as it appears in the Joint Appendix at pages 10-16- alleges that officers of the DPD deprived Harbin of his rights under the Fourth and Fourteenth Amendments by taking him into custody on September 28, 2000, and leaving him without medical assistance until he was "overcome by an injury that caused his death." The complaint further alleges that he was determined to be "dead on scene" at 5:30 a.m. on September 29, 1998, and that he "underwent many enduring hours of pain and suffering without care or other support from any of the defendants." That fact statement makes no sense, and nothing in that fact statement bears any relation to the facts on which the summary judgment is based or the facts presented by the parties in this appeal. We find nothing in the record to explain the discrepancy between the facts alleged in the complaint and the facts in the record, but inasmuch as neither the district court judge nor the parties make any mention of the discrepancy, we will proceed on the basis of the factual record on which the district court based its summary judgment order.

At around 9:30 p.m. on August 28, 2000, the Detroit Police stopped a vehicle driven by Ricardo Harbin for running a stop sign. Harbin was arrested for driving without a license and his passenger, Troy Washington, was arrested on an outstanding felony warrant. Both men were taken to the Sixth Precinct Station House, where they were initially placed in a holding cell.

The only testimony in the record about the circumstances of Harbin's pretrial detention in the Sixth Precinct Station House comes from Troy Washington. According to Washington's deposition, Harbin began complaining of chest pains shortly after being brought to the station and tried to get the attention of an officer who was on duty at the booking station, which is located across the hall from the holding cell. Washington said that the booking officer was processing a male

2

detainee at the time and a group of female detainees were screaming and causing a commotion. When Harbin called out "Jailer, I'm having chest pains," the booking officer appeared to glance in the direction of Harbin's cell, but did not acknowledge that he heard Harbin's complaints. After his initial attempt to make contact with the booking officer, Harbin, who was at this point clutching his chest and lying down, again tried to summon the booking officer without success.

Approximately 20 minutes after Harbin's first attempt to attract the attention of the booking officer, a Sergeant with whom Harbin was acquainted walked down the hallway past the holding cell. After Harbin asked "can I have a word with you?" the Sergeant removed him from the holding cell and the two walked around the corner and apparently had a conversation. Washington did not hear any of this conversation, nor was he able to observe whether Harbin was clutching his chest while he was talking with the Sergeant. Harbin was, however, again holding his chest when he came back into the holding cell after he talked with the Sergeant.

Shortly after the Sergeant returned him to the holding cell, Harbin again tried to get the booking officer's attention by complaining of chest pains. The booking officer again looked in the holding cell's direction, but never acknowledged Harbin. After spending about 45 minutes in the holding cell, Washington was transferred to another cell on the same side of the hall. From his new vantage point, Washington could hear, but not see, what was going on in Harbin's cell. At some point that night, Washington was awakened by Harbin's calls for a jailer. Washington testified that a jailer, who was not the booking officer, walked over to Harbin's cell, returned to the booking station and 20-30 minutes later removed Harbin from his cell. Because Washington had been intermittently sleeping during the entire episode, he was unable to say exactly when this officer removed Harbin from his cell. Washington testified that as Harbin left his cell, he was bent over,

3

apparently in pain. Washington had no information about where Harbin was taken or any further events of that night.

A report by the DPD's Special Investigations Unit concluded that none of the officers involved had mistreated Harbin. The report found that Harbin complained of chest pains at around 3:00 a.m. on August 29, 2000, and was taken to the hospital immediately after a scout car arrived at the Sixth Precinct Station House at around 3:40 a.m. Hospital records indicate that Harbin arrived at the hospital at 3:31 a.m., and that by 3:48 a.m., his pain had been eliminated and his condition stabilized. Just after 3:00 p.m. that afternoon, however, Harbin became unresponsive and efforts to revive him failed. The coroner's report concluded that Harbin died of a heart attack which was caused by "severe coronary artery disease."

Joseph originally filed this 42 U.S.C. § 1983 action against the City of Detroit and two unknown police officers in state court, and the City removed the action to the United States District Court for the Eastern District of Michigan. The complaint alleged that the defendants had violated Harbin's constitutional rights by failing to provide or secure medical treatment while he was in custody; that the DPD had a sordid history of prisoner neglect; and that the City's failure to train officers, properly monitor and screen detainees for medical problems, and discipline abusive officers equated to deliberate indifference to Harbin's medical needs. Joseph never attempted to substitute any named police officers for the two John Doe defendants, opting instead to file a separate state court action against them. The officers' attempt to remove the state court action to federal court and to consolidate it with this action was unsuccessful because it was untimely, and this action proceeded against the City only. Holding that the record failed to demonstrate that the City was

4

deliberately indifferent to Harbin's medical needs, the district court dismissed Joseph's case on summary judgment. Joseph brought this timely appeal.

## II.

We review de novo the district court's grant of summary judgment. *Pinney Dock and Transp. Corp. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir. 1988). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, *Inc.,* 477 U.S. 242, 248 (1986). When reviewing a motion for summary judgment, we must view all of the evidence and any inferences that may be drawn from that evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In her "Statement of the Case" in her opening brief, Joseph says that the DPD officers violated Harbin's rights as a pre-trial detainee by failing to provide or secure medical treatment for him while he was in their custody, and that the direct moving force behind the officers' conduct was the City's "pattern and practice of deliberate indifference to pre-trial detainee's serious medical needs spanning as evidenced over a ten-year period."[1] Joseph's sole claim in this action, however,

---

[1]Because Harbin survived for 12 hours after his arrival at the hospital, Joseph does not attribute his death to the DPD.

is against the City, and in her "Summary of the Argument," Joseph claims that the City itself demonstrated deliberate indifference to Harbin's constitutional right to adequate medical care.

To prevail under § 1983, the plaintiff must show that a person acting under color of state law deprived him of rights secured by the United States Constitution or laws of the United States. *Mills v. City of Barbourville*, 389 F.3d 568, 574 (6th Cir. 2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S. Ct. 1598, 1604, 26 L.Ed.2d 142 (1970)). Joseph therefore must prove that while Harbin was in the custody of the Detroit Police Department, 1) a constitutional violation occurred and 2) the City "is responsible for that violation." *See Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004). In order to prove that a violation occurred, Joseph must show that Detroit police officers—none of whom are named as defendants in the instant complaint—violated Harbin's constitutional rights. And to prove that the City is responsible for that violation, Joseph must show that the City's policy or custom was the "moving force" behind the constitutional violations of municipal employees; the City cannot be held vicariously liable for the torts of the police officers. *Monell v. Dep't. of Soc. Servs. of the City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2038, 56 L. Ed. 2d 611 (1978); *Gregory v. Shelby County,* 220 F.3d 433, 441-42 (6th Cir. 2000); *Doe v. Claiborne County,* 103 F.3d 495, 507-08 (6th Cir. 1996). But Joseph also argues that the City's direct actions, independent of any actions on the part of the police officers, demonstrated deliberate indifference to Harbin's medical needs, in violation of his constitutional rights. We will address each theory.

Though the Eighth Amendment's prohibition of cruel and unusual punishment does not apply to pretrial detainees, the Fourteenth Amendment's Due Process Clause affords pretrial detainees a right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners.

6

*Weaver v. Shadoan*, 340 F.3d 398, 410 (6th Cir. 2003). We have applied the cruel and unusual

punishment analysis used in *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d

251 (1976) to cases in which a pretrial detainee asserts that a municipal government violated his

Fourteenth Amendment rights. *See, e.g., Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir.

2001); *Horn by Parks v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994); *Roberts

v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985). Under *Estelle*, jail officials violate detainees' due

process rights when they "exhibit a deliberate indifference to the medical needs of the detainees that

is tantamount to an intent to punish." *Danese v. Asman*, 875 F.2d 1239, 1243 (6th Cir. 1989); *see

also Horn*, 22 F.3d at 660. A prison official can inflict cruel and unusual punishment by

intentionally denying a prisoner access to medical care or delaying the prisoner's access to that care.

*Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004).

In *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S. Ct. 1970, 1974, 128 L. Ed. 2d 811 (1994),

the Supreme Court held that "[a] prison official's 'deliberate indifference' to a substantial risk of

serious harm to an inmate violates the Eighth Amendment." "Deliberate indifference," the Court

held, requires that the official "was subjectively aware of the risk." *Id.* at 829. It is not enough that

the inmate demonstrate an objectively substantial risk of serious harm; because the Eighth

Amendment is implicated only when the prison official unnecessarily and wantonly inflicts pain,

the inmate must also demonstrate that the official had a "sufficiently culpable state of mind." *Id.*

at 834. "In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate

health or safety." *Id.* Applying this standard to Eighth Amendment claims of denial of medical care,

we have held that under *Farmer*, such a claim has both an objective and a subjective component.

*Blackmore*, 390 F.3d at 895. The objective component requires the existence of a "sufficiently

7

serious" medical need. *Id.* (quoting *Farmer*, 511 U.S. at 834). To satisfy the subjective component, which "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment,'" *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S. Ct. 2321, 2323, 115 L. Ed. 2d (1991)), the detainee must show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Blackmore*, 390 F.3d at 895 (internal quotation omitted). The *Farmer* Court articulated the requirements for a deliberately indifferent state of mind:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. This circuit has compared *Farmer*'s requisite mental state to the criminal law's "subjective recklessness." *See Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004).

Joseph has failed to demonstrate that Harbin suffered a constitutional violation. The evidence in the record would not permit a jury to conclude that the officers were aware of the facts from which the inference that Harbin faced a substantial risk of serious harm could be drawn, let alone that they actually drew that inference, which is required to satisfy *Farmer*'s subjective component. Though Washington testified that Harbin cried out for help, the record contains absolutely no evidence demonstrating that the booking officer heard these pleas over the commotion caused by the female detainees who were being processed. Other than Washington's testimony that the booking officer twice looked in the direction of the holding cell, there is no evidence that the booking officer paid Harbin any attention whatsoever. Two glances shot in the direction of the

8

booking cell during a 45-minute period are not enough to permit a jury to infer that the booking officer even heard Harbin's calls.

Even assuming that the booking officer did hear Harbin's cries, the record contains no evidence to support the conclusion that the booking officer actually drew the inference that Harbin faced a substantial risk of serious harm. Washington's testimony that the booking officer was busy processing a male detainee and herding noisy female detainees into holding cells certainly does not support such an inference. Indeed, Washington's testimony describes an officer who was preoccupied and was not aware of Harbin's condition. Moreover, Washington's description of the booking officer as a "mild-tempered" man who "wasn't like he had an attitude or nothing [sic]," suggests that his delay in calling for medical assistance was not tantamount to an intent to inflict cruel and unusual punishment on Harbin, a pretrial detainee who faced only charges of driving on a suspended license.

Nor does the record support the conclusion that the Sergeant inferred that Harbin faced a serious risk of harm. Nothing in Washington's description of Harbin's contact with the Sergeant conveys any sense of urgency, and because Washington was unable to recount the contents of the ensuing conversation, we simply cannot know whether, or in what manner, Harbin complained of chest pains. Assuming *arguendo* that Harbin did inform the Sergeant of his chest pains, *see Farmer*, 511 U.S. at 842 (an officer's deliberate indifference may be inferred from circumstantial evidence), Joseph has failed to produce any evidence suggesting that the Sergeant's failure to call for medical help immediately rose to the level of anything beyond simple negligence. Mere negligence does not rise to the level of deliberate indifference. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001);

9

*Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994); *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988).

The failure of the officers to recognize Harbin's medical need is not, of course, evidence of deliberate indifference. As *Farmer* makes clear, the officers must not only be aware of the facts from which they could draw the inference that Harbin had a serious medical need, they also must draw that inference. *Farmer*, 511 U.S. at 837. This circuit has held, albeit in an unpublished opinion, that "[b]ecause [police officers and prison guards] are laypersons, not physicians, we must determine if 'a layperson would easily recognize the necessity for a doctor's attention' under the circumstances presented here." *Vaughn v. City of Lebanon*, 18 Fed. Appx. 252, 273 (6th Cir. Aug. 16, 2001) (quoting *Hill v. Dekalb Reg'l Youth Detention Ctr.,* 40 F.3d 1176, 1187 (11th Cir. 1994)). Washington testified that Harbin had broken out in a "light sweat" and was intermittently clutching his chest. Given that this episode occurred at night in the confines of a chaotic holding cell in a Detroit Police Department Precinct, we cannot conclude that a layperson observing Harbin's condition would have "easily recognize[d] the necessity for a doctor's attention." *Vaughn*, 18 Fed. Appx. at 273.

Joseph's brief argues that Harbin's suffering would have been avoided had the DPD officers monitored the holding cells more diligently. Even assuming this to be true, however, "it is not enough for plaintiff to demonstrate a question of fact whether the police officers or sheriff's deputies *should have* known" that Harbin was in danger. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001); *see also Weaver*, 340 F.3d at 410-11; *Sanderfer v. Nichols*, 62 F.3d 151, 155 (6th Cir. 1995). Because the subjective component of *Farmer* "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment,'" only those facts

10

of which the officers had *actual* knowledge are germane to the analysis. *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 297).

Because Joseph cannot demonstrate that the officers were deliberately indifferent to Harbin's medical needs, she cannot demonstrate that any constitutional violation occurred. She therefore cannot demonstrate that the City was the "moving force" behind the claimed violation.

Joseph also argues, however, that the City's direct actions, independent of any actions on the part of the police officers, demonstrated deliberate indifference to Harbin's medical needs, in violation of his constitutional rights. Relying on *City of Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) ("*Harris*"), Joseph argues that *Farmer*'s subjective prong is irrelevant in this case because the City's failure to train its officers and to monitor and screen detainees for health problems inflicted an objectively serious injury on Harbin.

*Harris* held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." 489 U.S. at 388. As the Supreme Court observed, however, *Harris* used the term "deliberate indifference" for the "purpose of identifying the threshold for holding a city responsible for the constitutional torts committed by its inadequately trained agents." *Collins v. City of Harker Heights*, 503 U.S. 115, 124, 112 S. Ct. 1061, 1068, 117 L. Ed. 2d 261 (1992). Indeed, *Harris* makes clear that a municipality's failure to train is constitutionally irrelevant if the plaintiff failed to demonstrate a resulting injury. 489 U.S. at 390-91 ("the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable *if it actually causes injury* . . . . [F]or liability to attach in this circumstance the identified deficiency in a city's training program must be closely related *to the ultimate injury*.

11

Thus . . . respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs.") (emphases added) (footnote omitted). Hence, a municipality's failure to train may be the moving force behind a resulting injury but cannot be an injury in and of itself.

Our interpretation of *Harris* is consistent with the well-settled rule that a municipality cannot be held liable under § 1983 unless a constitutional violation by its agents is first established. *Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir. 2002) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 1573, 89 L.Ed.2d 806 (1986)). Relying on this principle, we have repeatedly declined to examine whether a municipal defendant provided its jail officers with adequate training when the plaintiff-detainee failed to present sufficient evidence of an underlying constitutional tort. *Crocker ex rel Estate of Tarzwell v. City of Macomb*, 119 Fed. Appx. 718, 724 (6th Cir. Jan. 4, 2005) ("If the plaintiff fails to establish a constitutional violation by an individual officer, the local government unit cannot be held liable for a failure to train under § 1983."); *Watkins,* 273 F.3d at 687 (holding that analysis of whether the municipal defendant failed to provide its jail officers with adequate training is unnecessary when the plaintiff-detainee fails to establish that the officers committed a constitutional violation); *Napier,* 238 F.3d at 743 (declining to consider whether the municipal defendant failed to provide adequate training to its jail officers because plaintiff-detainee "cannot show that he suffered an underlying constitutional violation").

Joseph does not, and cannot, claim that Harbin did not receive medical care. The essence of her claim is that the City denied Harbin's constitutional rights by failing to train its officers to recognize Harbin's heart problem so that medical care would be provided as promptly as Harbin—or

Joseph—believed was appropriate. She cites no authority to support this definition of the constitutional right to medical care, and we have found none.

**III.**

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

**R. Guy Cole, Jr., Circuit Judge, dissenting**. Under *Farmer v. Brennan*, 511 U.S. 825 (1994), and this circuit's case precedent, a prison official's deliberate indifference to the serious medical needs of a prisoner or pretrial detainee violates the Eighth Amendment *Id.* at 834; *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001). As it relates to the failure to provide medical care, we have held that deliberate indifference has both an objective and subjective component. Under the objective component, the plaintiff must show that the medical need was "sufficiently serious." *Farmer*, 511 U.S. at 534; *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004). Under the subjective component, the plaintiff must show that the government actor "had a sufficiently culpable state of mind." *Farmer*, 511 U.S. at 534; *Blackmore*, 390 F.3d at 895. In other words, the government actor "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer* 511 U.S. at 837. This circuit has noted that the requisite mental state for deliberate indifference is not an "express intent to inflict unnecessary pain." *Scicluna v. Wells*, 345 F.3d 441, 445 (6th Cir. 2003); rather, the requisite mental state is similar to the "subjective recklessness" of the criminal law. *Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004).

In this case, the district court granted a motion for summary judgment in favor of the City. Accordingly, to defeat the City's request for summary judgment, the plaintiff was required to present evidence that the City acted with deliberate indifference. In considering the City's motion, the court must view the evidence and draw all reasonable inferences in the light most favorable to the plaintiff. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate only when there is no genuine issue of material fact such that the City is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

14

In my view, the majority errs in its conclusion that the plaintiff has failed to establish deliberate indifference for the purposes of summary judgment. First, it is clear that the objective component has been satisfied by the plaintiff; i.e. Harbin's medical need was sufficiently serious. The evidence establishes that Harbin experienced intense chest pains, exhibited a light sweat, vocalized his discomfort, clutched at his chest, and eventually collapsed while in pretrial detention. These are classic symptoms of heart failure, which is undoubtedly a sufficiently serious need requiring prompt medical attention. *See, e.g., Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (holding that chest pains that may indicate a heart attack are sufficiently serious to satisfy the objective prong of *Farmer*).

As to the subjective component—that the government actor had a "sufficiently culpable state of mind"—the majority correctly notes that much of the evidence presented by the plaintiff regarding whether the prison guards subjectively inferred that he was suffering from a serious risk of medical harm comes from Troy Washington, who was detained along with Harbin. In a deposition, Washington testified that the plaintiff was continually complaining of chest pains during the pretrial detention. Furthermore, Washington testified that a prison guard noticed his complaints, but did not take any action. J.A. at 198-200. Washington further testified that after complaining of chest pains, Harbin had a conversation with a police sergeant, though Washington could not identify the content of that conversation. J.A. at 199. Harbin was then placed into another holding cell. Later that night, Washington heard Harbin yell for approximately 30 minutes, "Jailer, I'm having heart trouble. Jailer man down." J.A. at 203-04. Shortly thereafter, Harbin was removed from the holding cell on a stretcher and transferred to a hospital.

15

Notwithstanding this evidence, the district court held that a lack of direct "evidence from the detaining officers as to what they knew or concluded about Harbin's need for medical attention" is an "insurmountable" obstacle for the claim. Similarly, the majority concludes that the evidence does not establish that the prison guards perceived that the plaintiff was complaining of chest pains. The majority further notes there is no evidence to support the view that the officers actually drew the inference of a substantial risk of harm.

However, noted by the majority, *Farmer* allows the use of ordinary circumstantial evidence to prove that a prison official acted with "knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."). Though the majority states "there is no evidence that the booking officer paid any attention whatsoever,"the record discloses otherwise. Washington testified that the holding cell occupied by Harbin and Washington was close to the booking officer. ("Well, he looked back—like I said, the distance was—we could be talking, and you could hear us, that's how close the tank was."). Washington also testified that Harbin made numerous attempts to get the attention of the booking officer, succeeded in getting the officer's attention, and then was ignored. ("And he called him two or three times. He acknowledged us because he looked back when he called him, 'Jailer, I'm having chest pains.'"). Though the officer did not vocalize an acknowledgment of Harbin's poor condition, Washington notes that during this time period Harbin was constantly grabbing his chest and stretched out on a bench. Washington further testified that Harbin had a conversation with the sergeant. Though Washington did not testify as to the content, the conversation took place during a time period in which Harbin was constantly complaining of chest pains and grabbing his

16

chest. J.A. at 192-202. Viewing this evidence in its totality, a genuine issue of material fact exists as to whether the prison guards actually noticed that Harbin was suffering from obvious symptoms of heart failure.

As noted by *Farmer*, the mere fact that an officer perceived the symptoms of heart failure is insufficient; the officer must also make the inference that such symptoms could result in a substantial risk of serious harm. *Farmer*, 511 U.S. at 837 (the government actor "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"). However, *Farmer* also notes that some risks are so obvious that the inference of a substantial risk of serious harm is made upon perception of the underlying facts. *Id.* at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."). In this case, a trier of fact could conclude that prison officials knew that there was a substantial risk of heart failure.

This conclusion is wholly consistent with the language of *Farmer*. As noted by the Supreme Court, even an obvious risk may be rebutted by the government actor. However, such inquiries are most properly left to the jury.

> Because, however, prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment, it remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety. That a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so. Prison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.

*Id.* at 844; *see also Curry v. Scott*, 249 F.3d 493, 508-09 (6th Cir. 2001) (where evidence supports the inference that prison officials knew of prison guard's employment record indicating animus

17

towards African-Americans and propensity for use of excessive force, government actor's actual knowledge of a substantial risk of serious harm should be left to the trier of fact).

Because I believe that there are genuine issues of material fact as concerns the subjective component of the test, I respectfully dissent.

**Thomas B. Russell, District Judge, concurring in judgment.**

I concur in the dismissal of the claims against the City, but I am writing separately to note my agreement with the dissent that taking the facts in the light most favorable to the Plaintiff results in the conclusion that Plaintiff has presented sufficient proof to raise a material issue of fact as to whether there has been a constitutional violation.

To prevail in a § 1983 action, the Plaintiff must prove two elements: "1) the deprivation of a right secured by the Constitution or laws of the United States and 2) that the deprivation was caused by a person acting under the color of state law." *Miller v. Calhoun County*, 408 F.3d 803, 812 (6th Cir. 2005). After the court finds the violation of a right, the municipality may be held liable if its policy was the "moving force" behind or caused the violation. *Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005). The court does not have to find any particular officer liable before the City can be held liable, but the court must find that the City caused a violation of Plaintiff's rights. *Id*. The Supreme Court has clearly set forth the law on the issue of municipal liability:

> We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. This rule is most consistent with our admonition in *Monell*, 436 U.S., at 694, 98 S.Ct., at 2037, and *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981), that a municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. As Justice BRENNAN's opinion in *Pembaur v. Cincinnati*, 475 U.S. 469, 483-484, 106 S.Ct. 1292, 1300-1301, 89 L.Ed.2d 452 (1986) (plurality) put it: "[M]unicipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. See also *Oklahoma City v. Tuttle*, 471 U.S., at 823, 105 S.Ct., at 2436 (opinion of REHNQUIST, J.). Only where a failure to train reflects a "deliberate" or "conscious"

19

choice by a municipality-a "policy" as defined by our prior cases-can a city be liable for such a failure under § 1983.

> *Monell*'s rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible. That much may be true. The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*City of Canton v. Harris*, 489 U.S. 378, 388-90 (1989) (footnotes omitted). In this case, Plaintiff alleges that the City's training was inadequate. The officers received training on what to do when a prisoner presents a health complaint. The Plaintiff has not shown that the officers have received no training or that they were trained to ignore complaints as the Plaintiff alleges that the officers did in this case. Instead, the officers received training on the policies and procedures of when to send the prisoner to the hospital. Plaintiff's alleged failure to receive medical care is the result of the officer's decision not provide medical treatment. Plaintiff cannot show that the City made a deliberate choice not to provide the officers with the necessary training or that such a decision caused Plaintiff's alleged constitutional violation. The City was not deliberately indifferent to the need to train its officers in proper police procedure.

20