NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0364n.06

No. 17-6309

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ROBERT MEDLEY, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | Jul 24, 2018 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| SHELBY COUNTY, KENTUCKY, et al., | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| Defendants-Appellees. | ) | |
| | ) | |

Before: SUTTON, McKEAGUE, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. While Robert Medley was jailed in the Shelby County Detention Center, another inmate burned him with scalding water. Medley received some care onsite, and was sent to the hospital 13 hours later. He thereafter brought this lawsuit, claiming that he should have been sent to the hospital sooner. The district court granted summary judgment to the defendants. We affirm.

I.

In 2012, Medley was being held in the Shelby County Detention Center pending trial. Around 5:45 p.m. one day, while Medley was asleep in his bunk, another inmate threw water from a "hot pot" on him. Within minutes, deputies took Medley for medical treatment. The night nurse told the doctor on call, Dr. Waldridge, that Medley had "superficial burns to his face, neck, chest and some of his back." Dr. Waldridge prescribed cold cloths (to cool the skin), Silvadene (an antibacterial burn cream), and ibuprofen (for pain). He continued that treatment after the nurse

reported that Medley's burns had formed blisters. When the nurse left at 10:30 p.m., Medley appeared to be resting.

Deputies checked on Medley throughout the night. Around 2:00 a.m., Sgt. Doyle called a supervising nurse with concerns about Medley's condition: "[f]ace blistering, dripping fluids, complaining he could not hear or see on the left side." That nurse said to keep monitoring him, and to give him Gatorade for hydration. Once the morning nurse, Nurse Peach, arrived at 6:00 a.m., she examined Medley. She told Dr. Waldridge that Medley "had some swelling and redness, blisters" and "needed to be further evaluated." Dr. Waldridge "advised [Nurse Peach] to take him to the ER." Medley was then taken to the hospital, and released a few days later.

Thereafter Medley sued everyone involved, including 11 jail deputies, the medical staff, Shelby County, and Southern Health Partners—the company responsible for providing medical care to inmates. The district court dismissed all claims against the medical staff as time-barred. The court later granted summary judgment to the other defendants. This appeal followed.

II.

Medley challenges only the grant of summary judgment, which we review de novo. *See Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018). Summary judgment was proper if Medley produced insufficient evidence for a reasonable jury to find in his favor. *See Hardrick v. City of Detroit*, 876 F.3d 238, 243 (6th Cir. 2017).

A.

Medley claims that the deputies are liable under 42 U.S.C. § 1983 because (he says) the delay in taking him to the hospital violated his constitutional rights. To prevail on that claim, Medley must prove that the deputies acted with deliberate indifference to his serious medical needs. *See Richmond*, 885 F.3d at 937-38. That requires, first and foremost here, evidence "that

the official[s] being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that [they] did in fact draw the inference, and that [they] then disregarded that risk." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009).

Here, most of the defendant deputies had little to no involvement with Medley or the incident at issue. And those deputies who were involved acted appropriately: two deputies took Medley for medical care soon after he was burned, others checked on him throughout the night, and Sgt. Doyle called the medical staff with concerns about Medley's condition. *See Winkler v. Madison County*, 893 F.3d 877, 895-96 (6th Cir. 2018). Although Medley asserts that there are triable issues as to whether the deputies disregarded a substantial risk to him, he fails to support that assertion with any specific evidence. *See* Appellant Br. 26, 30. And without evidence, summary judgment for the deputies is appropriate.

B.

Medley next claims that the deputies are liable for several torts under Kentucky law, namely negligence, outrage, intentional infliction of emotional distress, assault, and battery. The deputies argue that qualified immunity protects them from liability. *See Rowan County v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006). To invoke qualified immunity, they must show that their duties were discretionary rather than ministerial. *See id.* at 476. Once they do, Medley must show that they performed those duties in bad faith. *See id.*

A discretionary duty involves "the exercise of discretion and judgment, or personal deliberation, decision, and judgment[,]" whereas a ministerial duty "requires only obedience to the orders of others, or . . . is absolute, certain, and imperative[.]" *Id.* at 477-78 (citation omitted). Whether a duty is discretionary or ministerial depends on the facts of the case. *See Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 809 n.9 (Ky. 2009).

Here, Medley's claim is based on an alleged lapse in judgment: he contends that the deputies should have recognized the severity of his burns, second-guessed the medical staff's decisions, and called an ambulance. Medley says their role was ministerial nonetheless because jail policies "set forth definite standards for the correctional staff concerning the medical care of prisoners[.]" Appellant Br. 34. Yet he fails to identify even one specific, concrete rule that any deputy violated. Hence the duty the deputies allegedly violated is discretionary. *See Jerauld ex rel. Robinson v. Kroger*, 353 S.W.3d 636, 640-42 (Ky. Ct. App. 2011); *cf. Marson v. Thomason*, 438 S.W.3d 292, 298-302 (Ky. 2014). Moreover, as shown above, the deputies discharged that duty in good faith—indeed, Medley offers no support to find otherwise. The deputies are therefore entitled to qualified immunity.

C.

Medley also claims that the County is liable under 42 U.S.C. § 1983 because (he says) its policy of outsourcing inmate medical care to a private company, Southern, violated his constitutional rights. Absent that policy, he asserts, Sgt. Doyle would have sent him to the hospital earlier than Southern's medical staff did.

To prevail on that claim, Medley must prove that the County's outsourcing policy is facially unconstitutional, or that it was adopted "with 'deliberate indifference' as to its known or obvious consequences." *Winkler*, 893 F.3d at 901 (citation omitted). That policy is not facially unconstitutional, for a County "may constitutionally contract with a private medical company to provide healthcare services to inmates." *Id.* And Medley offers no evidence that outsourcing inmate medical care to Southern raises "an obvious risk to inmates' constitutional rights to adequate medical care." *See id.* at 902. Rather, his "argument is essentially that the County's policy did not, in this particular case, adequately address [his] specific medical needs." *Graham*

*ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004). That is not enough to hold the County liable for a constitutional violation. *See id.* at 384-85.

Separately, Medley suggests that the County failed to train its deputies adequately. There are two ways to prove that theory of liability: first, Medley may show that the County "fail[ed] to act in response to repeated complaints of constitutional violations by its officers"; or second, he may show that a rights violation is a "highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." *Winkler*, 893 F.3d at 903 (citations omitted). Medley has neither kind of proof, so this claim fails.

D.

Finally, Medley claims that Southern is liable under 42 U.S.C. § 1983 because (he says) it had a practice of giving inmates constitutionally inadequate medical care. *See generally Winkler*, 893 F.3d at 904. In support, he cites Nurse Peach's testimony that she was usually required to ask her supervisor before calling a doctor about a patient. Medley must prove that this practice caused his injury, however, and here Nurse Peach bypassed her supervisor and called Dr. Waldridge about Medley directly. *See, e.g.*, *Graham*, 358 F.3d at 383. Hence this claim fails too.

\* \* \*

The district court's judgment is affirmed.